RIXIE TORRE GINÉS, por sí y como albacea testamentaria de JOAQUÍN TORRE NORIEGA, demandantes y recurrentes, *v.* ESTADO LIBRE ASOCIADO DE PUERTO RICO, demandado y recurrido.

*Número:* RE-86-181     *Resuelto:* 9 de marzo de 1987

438

440

*José Alberty Orona*, abogado de la recurrente, *Rafael Ortiz Ca-rrión, Procurador General, Juan F. Fuster, Procurador Gene-ral Auxiliar, Luisa A. Inclán Bird, Procuradora General Au-xiliar*, abogados de El Pueblo.

EL JUEZ ASOCIADO SEÑOR NEGRÓN GARCÍA emitió la opinión del Tribunal.

I

Joaquín Torre Noriega, ex legislador, agricultor, comer-ciante, y residente de Ciales, el 31 de enero de 1965 suscribió testamento ológrafo. Falleció el 9 de diciembre de 1975. Su tes-tamento oportunamente fue protocolizado en virtud de trámite habido en el Tribunal Superior, Sala de Arecibo (Civil Núm. 75-3658).

Dicho foro, por resolución subsiguiente emitida en el caso Civil Núm. 81-3306,([1]) decretó herederos universales a José

---

([1]) Conforme el Art. 875 del Código Civil, tendrá lugar la sucesión legítima "[c]uando el testamento no contiene institución de heredero en

Luis Agustín Torre Pagán, Rixie Torre Ginés, Carmen Delia Torre Reyes, Luz Celenia Torre Reyes, María Matilde Torre Santiago (conocida como Joaquina Santiago), Roberto Joaquín Torre Rodríguez y Olimpia María Torre Rodríguez. También adquirió igual condición, como resultado de una adopción reafirmada por Torre Noriega en dicho testamento —previa acción sobre sentencia declaratoria y en virtud de sentencia emitida por este Tribunal (O-83-660)— su hija de crianza Aida Villafañe Reyes. En total, ocho (8) son sus herederos forzosos.

Al morir, Torre Noriega dejó como únicos bienes cuatro propiedades localizadas en el municipio de Ciales. (²)

---

todo o en parte de los bienes, o no dispone de todos los que corresponden al testador. En este caso, la sucesión legítima tendrá lugar solamente respecto de los bienes de que no hubiese dispuesto". 31 L.P.R.A. sec. 2591.

Luego de otro trámite judicial (Civil Núm. 83-673), el Tribunal Superior, Sala de Arecibo, dictó sentencia y reconoció que los inmuebles inscritos a favor de Sucesores de F. Pintueles y Co., pertenecían a los herederos de Torre Noriega.

(²)Tres son urbanas. Sus descripciones, incluyendo la primera —que constituye desde hace años la residencia de la recurrente Torre Ginés— son:

"URBANA: Solar de 187.00 metros cuadrados, radicado en la Calle José de Diego, Esq. Calle Muñoz Rivera de Ciales. Contiene una estructura de madera y zinc de dos plantas. Inscrita a los tomos 29 y 85, folios 20 y 114 de Ciales, finca número 519. Según tasación de Hacienda ti[e]ne un valor de $14,770.00.

"URBANA: Solar de 736.00 metros cuadrados, radicado en la Calle Muñoz Rivera de Ciales. Contiene una estructura de ladrillos de construcción antigua. Inscrita a los folios 4, 136 y 250, de los tomos 23, 69 y 71 de Ciales, finca número 1307. Según tasación de Hacienda tiene un valor de $32,720.00.

"URBANA: Solar de 543.00 metros cuadrados, radicado en la Calle Muñoz Rivera de Ciales. Contiene una estructura de ladrillos de construcción antigua. Inscrita al folio 3, del tomo 23 de Ciales, finca número 1305. Según tasación de Hacienda tiene un valor de $31,910.00." Apéndice V, págs. 26–27.

La restante es una finca rústica enclavada, según el tribunal sentenciador, baldía, de superficie rocosa y accidentada:

"RÚSTICA: Porción de Tierra de 15.00 cuerdas, según Registro y de 23.50 cuerdas, según el Negociado de Contribución sobre la Propiedad y Herencia, radicado en la Carretera 149 (Expreso), Km. 12.1, Bo. Jaguas de Ciales. Según tasación de Hacienda tiene un valor de $37,000.00." Apéndice V, pág. 27.

Por su importancia decisoria, transcribimos integralmente su testamento:

– – – – – – – – JOAQUIN TORRE NORIEGA – – – – – – – –
– – – – – – – – – – CIALES, PUERTO RICO – – – – – – – – – –
– – – – *Mi Última Voluntad y Testamento Ológrafo* – – – –
Yo, Joaquín Torre Noriega, residente en la Calle Muñoz Rivera, esquina José de Diego, en Ciales, Puerto Rico, por la presente declaro que este instrumento es mi última voluntad y testamento, en la manera siguiente, esto es:

Por la presente cancelo y revoco el anterior testamento ológrafo que hice el día 24 de enero de 1950, excepto el Artículo Segundo (página una) que concierne a la adopción de mi hija Aida Villafañe Reyes que queda patente.

Por el presente testamento reconozco a José Luis Agustín Pagán, conocido como Luis, que nació en Ciales, P.R., el 28 de agosto de 1922, hijo de Guadalupe Pagán Caballero, como mi hijo.

Lego mi cuerpo a la Escuela de Medicina de la Universidad de Puerto Rico, para propósitos de investigación médica, a la memoria del fenecido patólogo de la Escuela de Medicina de P.R., Doctor Enrique Koppisch de Cardona.

*Lego el tercio de mi libre disposición* a mi hija Rixie Torre Ginés, y *en particular la casa y garage ubicada en la Calle Muñoz Rivera,* esquina José de Diego, *donde he vivido* por más de medio siglo.

*Lego al Estado Libre Asociado de Puerto Rico,* en mi autoridad moral y carácter de socio gestor de Sucrs. de F. Pintueles & Co., S. en C., de Ciales, Puerto Rico, *los edificios y anexos, situan* [sic] *en la Calle Muñoz Rivera Números 13 y 15, en Ciales, P.R.* Dichos edificios y anexos han estado utilizados [*sic*] —sin limitación ni compensación alguna en los últimos 25 años por instrumentalidades de nuestro gobierno (AEE y JEE) y el Partido Popular Democrático de Puerto Rico.

Por el presente documento nombro y designo tutoras de mi hija incapacitada Carmen Delia Torre Reyes, a mis hijas Luz Celenia Torre Reyes y Aida Villafañe Reyes.

Por la presente designo y nombro mis albaceas testamentarios a Rixie Torre Ginés, Luz C. Torre Reyes, Salvador Villanueva Pintueles, Senador Li[c.] Luis A. Negrón López, José Colón Joy, Ovidio Lamoso Coira y Enrique Montes

Reyes, quienes serán los [*executers*] de mi última voluntad y testamento.
Dado en Ciales, Puerto Rico, 31 de enero de 1965. . . .
[(*FDO.*)] JOAQUIN TORRE NORIEGA." (Énfasis suplido.) Apéndice II, págs. 7–8.

El 25 de febrero de 1982, Rixie Torre Ginés, por sí y como albacea, ([3]) impugnó judicialmente la validez del legado hecho en favor del Estado Libre Asociado de Puerto Rico. Previa contestación del Estado, luego de varios incidentes, el caso quedó sometido por prueba documental. El Tribunal Superior, Sala de Arecibo, por sentencia de 12 de marzo de 1986, sostuvo "que el legado a la demandante e[ra] imputable al tercio de mejora. En cuanto al legado al Estado Libre Asociado valorado en $32,700.00 no es inoficioso o excesivo pues el tercio de libre disposición puede ser hasta la suma de $38,933.33, por lo que sobra un remanente en dicho tercio de $6,213.33. En relación al otro legado al Estado Libre Asociado valorado en $31,910.00 es excesivo y la reducción no absorbe la mitad de su valor por lo que dicho legado pertenece a los herederos forzosos siempre y cuando éstos abonen al Estado Libre Asociado la suma de $6,213.33". Apéndice V, pág. 31.

No conforme, a solicitud de Torre Ginés concedimos término al Estado para que compareciera a mostrar causa, por la cual no deberíamos modificar la sentencia recurrida en los siguientes aspectos: (1) excluir las fincas en que están sitas las estructuras que constituyen los legados específicos; (2) imputar los legados hechos a la recurrente con cargo al tercio de libre disposición, 31 L.P.R.A. sec. 2395; (3) reducir a

---

[3] En esa capacidad, ella tiene la obligación de "[v]igilar sobre la ejecución de todo lo demás ordenado en el testamento, y sostener, siendo justo, su validez en juicio y fuera de él". Art. 824 del Código Civil, 31 L.P.R.A. sec. 2521(3). En esencia, su solicitud es que cumplamos con la voluntad del testador en la entrega de los legados dispuestos por testamento. Recuérdese que en este caso existen ocho (8) herederos forzosos que están obligados a entregar tales legados. Art. 782 del Código Civil, 31 L.P.R.A. sec. 2471.

prorrata todos los legados en cuanto exceden el tercio de libre disposición, 31 L.P.R.A. sec. 2374; (4) reputar como mejora los legados hechos a la recurrente en cuanto no quepan en la parte libre, 31 L.P.R.A. sec. 2395. Además solicitamos nos ilustrara sobre el efecto que pudiera tener el legado a la recurrente del tercio de libre disposición, en atención al procedimiento de reducción a prorrata antes señalado. 31 L.P.R.A. secs. 2374, 2498. Tenemos el beneficio de la comparecencia del Estado.

## II

Los planteamientos e interrogantes antes aludidos tienen su génesis en la innegable realidad de que Torre Noriega no dejó nada a siete de los herederos forzosos en su testamento ológrafo. Por ende es nula toda institución de herederos que haya hecho en el testamento; sin embargo, *valen las mandas y mejoras en cuanto no sean inoficiosas*. Art. 742 del Código Civil, 31 L.P.R.A. sec. 2368. *Cortés* v. *Cortés*, 73 D.P.R. 693 (1952).([4]) La solución del caso nos compele a identificar inicialmente el carácter dispositivo de los bienes y la verdadera intención del causante en virtud de la siguiente expresión: *"Lego el tercio de mi libre disposición a mi hija Rixie Torre Ginés, y en particular la casa y garage* ubicada en la Calle Muñoz Rivera, esquina José de Diego. . . . *Lego al Estado Libre Asociado de Puerto Rico . . . los edificios y anexos*, situan [*sic*] en la Calle Muñoz Rivera Números 13 y 15, en Ciales." (Énfasis suplido.) Apéndice II, pág. 3.

---

([4])"En suma: a) no es preciso que el testamento contenga institución de heredero; b) caso de haberla, no es necesario que comprenda todos los bienes, pudiendo dejarse de disponer de alguna fracción del patrimonio, respecto de la cual se abre la sucesión intestada; c) de no haber institución en el testamento, normalmente será heredero el designado por ley, mas probablemente no ocurre así cuando toda la herencia se reparte en legados." J. L. Lacruz Berdejo, *Derecho de Sucesiones*, Barcelona, Ed. Bosch, 1971, Vol. 1, pág. 542.

■ Esta misión nos lleva al ámbito judicial en materia de interpretación de testamentos. Si bien es compleja, en definitiva, "[i]nterpretar algo es averiguar su sentido". G. Alférez Callejón, *El Testamento y su Interpretación*, 49 Rev. C. Der. Inmob. 69, 98 (enero–junio 1973). El punto de partida es el Art. 624 del Código Civil. Reza:

> Toda disposición testamentaria deberá entenderse en el sentido literal de sus palabras, a no ser que aparezca claramente que fue otra la voluntad del testador. *En caso de duda* se observará *lo que parezca más conforme a la intención del testador*, según *el tenor del mismo testamento*. (Énfasis suplido.) 31 L.P.R.A. sec. 2129.

■ Es profusa y rica la literatura sobre la dinámica hermenéutica que inspira este precepto, a saber, que "el testamento es una de las manifestaciones —quizás la más pura— del principio de la autonomía de la voluntad". M. García Amigó, *Interpretación del Testamento*, 53 Rev. Der. Privado 931 (1969). Un dedicado jurista puertorriqueño compendia satisfactoriamente esta regla básica expresando que "[l]o que en definitiva ordena el Art. 624 es que prevalezca la voluntad real del testador y el rol judicial en materia de interpretación testamentaria consiste en *descubrir dicha voluntad a fin de que se produzcan en su día los efectos queridos por el testador, dentro del marco permitido por ley*. Cuando el lenguaje usado es claro y la intención del disponente se manifiesta diáfanamente de una lectura literal de las disposiciones del testamento, la labor judicial resulta sencilla. Sin embargo, muchas veces el texto del testamento es claro, el lenguaje no ofrece dudas, pero no necesariamente la voluntad real y querida, coinciden con la voluntad expresada". (Énfasis suplido y escolios omitidos.) E. González Tejera, *Derecho Sucesorio Puertorriqueño*, San Juan, Ed. Ramallo, 1983, Vol. II, pág. 55. En idéntica dirección unánimemente se desplaza la glosa española. "Fin esencial de la función del intérprete del testamento es descubrir y declarar la voluntad del testador. Sin desnatu-

446

ralizar las cláusulas claras, el intérprete debe aclarar las oscuras y contradictorias de acuerdo con el sentido que cabe presumir que el testador pretendió darl[e]s." J. Castán, *Derecho civil español, común y foral*, 8va ed., Madrid, Ed. Reus, 1979, T. VI, Vol. 2, pág. 326. Nuestra jurisprudencia sigue igual trayectoria al sancionar la tesis de interpretación subjetiva. *Vivaldi* v. *Registrador*, 86 D.P.R. 629, 641 (1962); *Luce & Co.* v. *Cianchini*, 76 D.P.R. 165 (1954); *Colmenero* v. *Fernández*, 63 D.P.R. 919 (1944).

"[E]sta interpretación literal ha de entenderse en un sentido sintáctico y actual, no puramente etimológico, de acuerdo con el significado general de la frase en que las expresiones se contienen." García Amigó, *op. cit.*, pág. 955. Sin embargo, la "interpretación del testamento presenta características propias frente a la de los negocios jurídicos *inter vivos*". J. B. Jordano Barea, *Interpretación del Testamento*, Barcelona, Ed. Bosch, 1958, pág. 13.

■ Esta notable diferencia se justifica en función a que su interpretación es una actividad distinta a la de los contratos bilaterales u otros negocios jurídicos. Versará en auscultar el contenido de una sola voluntad, según Traviesas, "puramente unilateral", que se apuntala en la voluntad del testador *no recepticia*, esto es, que no depende de la aceptación por otra persona. J. Ossorio Morales, *Manual de Sucesión Testada*, Madrid, Inst. Estudios Políticos, 1957, pág. 409. Bajo esta óptica para averiguar la real *mens testatoris* prevalece la denominada interpretación "subjetiva".([5]) En síntesis, su

---

(5) Alférez Callejón, otra vez citando a Jordano Barea, sintetiza "los principales argumentos de la doctrina, justificativa de la interpretación subjetiva del testamento, en los siguientes extremos:

"1. La gratuidad del testamento. Al constituir normalmente la institución de heredero o nombramiento de legatario un acto gratuito del disponente en favor de los beneficiarios, es lógico que sea exclusivamente la voluntad del testador la que se tenga en cuenta en el destino de los bienes, puesto que no existe contraprestación alguna por parte de los favorecidos.

mecánica implica que "el intérprete debe 'ponerse en el lugar del testador'; 'reencarnar al testador' (Jordano Barea); 're-vivir el acto espiritual de otro' (Betti); 'resucitar al testador como a Lázaro' (Koschaker)". Alférez Callejón, *op. cit.*, pág. 109. Para alcanzar esta meta es menester acudir a varios enfoques. Examinémoslos.

"2. La no receptibilidad del testamento. El testamento es un acto unilateral no recepticio y, por tanto, no destinado a combinarse con otra declaración de voluntad, por lo cual es lógico que se atribuya al sentido subjetivo del declarante (testador) el poder decisorio en materia de interpretación.

"3. El testamento es medio de conocimiento y no de vinculación. La declaración testamentaria se destina fundamentalmente a dar a conocer a quienes viven la última voluntad del declarante, mientras que las declaraciones *inter vivos* son medios de vincular a las personas y como tales deben ser jurídicamente tratadas. Su finalidad es regular el destino *post mortem* del propio patrimonio (que el difunto no se puede llevar), más aún que atribuir o dejar algo a alguien. El testador no se obliga a nada, no promete observar en el futuro—que ya no existirá para él—una determinada conducta; solamente manifiesta su voluntad sobre el destino que quiere se dé a su patrimonio cuando fallezca.

"4. La imposibilidad de renovación del testamento. En los actos *inter vivos,* si se da a la expresión de voluntad de los interesados un sentido distinto al deseado, podrán rectificarse las consecuencias mediante una nueva manifestación de voluntad. En los testamentos esto no es posible al haber fallecido su autor, por lo que la interpretación de los mismos debe respetar lo más fielmente posible la auténtica voluntad del causante.

"5. Preferencia del beneficiario real sobre el aparente. Según se siga una interpretación objetiva o subjetiva del testamento serán beneficiarios unos u otros herederos. Parece más lógico que un posible conflicto de intereses entre ambos, ninguno de los cuales tiene un auténtico derecho exigible, se dé preferencia al que señala la auténtica y real voluntad del testador, único titular del patrimonio que dispone *post mortem* de sus bienes, sobre el beneficiario aparente, que resulta de una interpretación literal u objetiva.

"6. La peculiar naturaleza y estructura del acto de última voluntad. El testamento es un acto especial que no adquiere relevancia jurídica hasta el fallecimiento del testador. Su voluntad no claramente expresada puede ir matizándose o, más exactamente, precisándose hasta ese momento. Lógicamente, si se produce un cambio radical otorgará un nuevo testamento, pero muchas veces el testador, con su conducta, escritos, manifestaciones, etc., podrá ir exteriorizando los perfiles de su voluntad contenida en el documento otorgado. Es natural que su último sentir se tenga en cuenta dadas las características del testamento que ya han sido expuestas." G. Alférez Callejón, *El Testamento y su Interpretación,* 49 Rev. C. Der. Inmob. 69, 104–105 (enero–junio 1973).

Primero, de la interpretación literal, "es decir, objetivada en los signos convencionales del lenguaje, aprisionada en las expresiones literales de las cláusulas testamentarias". García Amigó, *op. cit.*, pág. 955.

No obstante, "sucede con frecuencia que el lenguaje del testador ofrece significados equívocos: puede tener uno de carácter general, común y normal, y otro peculiar y propio del causante; pues bien, cuando pueda demostrarse cuál sea éste, ha de prevalecer sobre el primero por la sencilla razón de que será el que expresa la voluntad auténtica del *de cuius* . . . . [C]uando haya un significado vulgar y otro legal de la palabra utilizada por el testador, debe considerarse el significado legal y no el usual, salvo que fuese clara la voluntad del testador en otro sentido[,] . . . pero en el caso de redacción por un profano en la ciencia jurídica entendemos que será más conforme a la voluntad del testador interpretar ésta de acuerdo con el sentido corriente y usual". García Amigó, *op. cit.*, págs. 955–956.

Segundo, el Código Civil "dedica asimismo, varios artículos que contienen determinadas reglas, llamadas por Amigó, 'normas subsidiarias de interpretación', de aplicación únicamente cuando la voluntad del testador es en extremo dudosa". González Tejera, *op. cit.*, Vol. II, pág. 53.

Tercero, de subsistir tales dudas o de estar la intención del testador consignada en forma imprecisa, deficiente o contradictoria, la voluntad se determinará mediante "una serie de procedimientos técnicos, que no son otros sino los propios de toda actividad racional y psicológica del hombre". García Amigó, *op. cit.*, pág. 958.

La doctrina científica identifica estos procedimientos como el *lógico*, el *sistemático* y el *teleológico*. El *sistemático* se realiza integrando y tomando en consideración la totalidad de las declaraciones de voluntad y no solamente las palabras o frases aisladas. García Amigó, *op. cit.*, pág. 960. El *lógico* implica discernir el elemento racional y decisorio expositivo

de sus efectos naturales y legítimos. Y finalmente, el *teleológico*, consiste en averiguar " 'el verdadero sentido que impuls[ó] la voluntad de la persona que disponía de sus bienes, que debe ser la que esté más conforme con la intención del otorgante' ". Íd., pág. 960.

Estos métodos o criterios "no pueden aislarse unos de otros ni ser escalonados como categorías o especies diversas de interpretación, pues no son más que medios o instrumentos que el intérprete ha de poner en juego dentro de un proceso interpretativo unitario . . . . [E]l artículo 675 del Código Civil [concordante al 624 nuestro] no impone, ni podría hacerlo, ese orden sucesivo de prelación en que se supone deben utilizarse los criterios interpretativos, . . . [ni] excluye que, para determinar si hay una clara voluntad del testador que obligue a no dar a las palabras [de éste] su sentido literal, . . . o para apreciar si hay, cuando menos, motivos de duda a este respecto, . . . se deban utilizar, conjunta y combinadamente, los instrumentos todos de la interpretación". S. de 6 de marzo de 1944, Núm. 6, 6 Jurisprudencia Civil 56, 82.

Bajo este esquema conceptual es aceptable, como técnica de adjudicación "prescindir de denominaciones jurídicas que no tenía por qué conocer el testador" (énfasis suprimido) (S. de 27 de marzo de 1928, Núm. 110, 182 Jurisprudencia Civil 703, 704, 721) ; atribuir "la significación más conforme a sus hábitos, cultura, circunstancias personales, etc.", Ossorio Morales, *op. cit.*, pág. 410 ; tomar en cuenta el "modo habitual de expresarse el testador", Castán, *op. cit.*, pág. 328, y su "lenguaje personal", F. De Castro y Bravo, *El Negocio Jurídico*, Madrid, Inst. Nac. Estudios Jurídicos, 1967, pág. 86. En definitiva, debemos evaluar "todas las circunstancias del caso, para dar a las palabras el sentido que sea más conforme a la situación, ideas y hábitos del testador". (Énfasis suprimido.) S. de 3 de junio de 1942, Núm. 760, IX Aranzadi, Repertorio de Jurisprudencia 760, 761.

■ También, en esa encuesta hermenéutica, —una vez agotada sin éxito la etapa de interpretación, en sí, de la disposición *mortis causa* por medios intrínsecos— es permisible acudir a prueba extrínseca. *Sucn. Cortijo* v. *Cruz*, 43 D.P.R. 839 (1932). L. Diez Picazo, *Lecciones de Derecho Civil: Sucesiones*, Madrid, Univ. Valencia, 1967, pág. 381; Jordano Barea, *op. cit.*, págs. 93–98. La S. de 6 de febrero de 1958, Núm. 76, 64 Jurisprudencia Civil 823, 831, resume así el fundamento de ese medio supletorio de prueba:

> La interpretación de los negocios jurídicos "mortis causa" ha de hacerse en función subjetiva de la voluntad del causante, que es la que da vida al act[o] en sus consecuencias jurídicas ulteriores al óbito, voluntad manifestada en signos o palabras *escritas* o simplemente *pronunciadas* en determinados casos de excepción que, en general responden a la intención de aquél, indagada por el intérprete a través del elemento gramatical conocido, no según el lenguaje ordinario de la comunidad en el sector social en que se hallaba nucleado el agente, *sino en el propio y peculiar de éste al referirse concretamente a sus bienes y derechos en la vida de relación,* ya que en otro supuesto podría incidir el juzgador en la grave falta de sustituir la voluntad real con otra no conocida con exactitud; [ya que, en definitiva, las palabras responden en general, a *los actos internos o mínimos de su autor*]. (Énfasis suplido.)

■ En resumen, en esta materia domina la interpretación subjetiva. Existen diversos métodos y criterios de adjudicación. En particular, de extrema importancia al caso de autos, como indica Jordano Barea, *op. cit.*, pág. 83. "[S]i se prescinde del 'ángulo visual' del testador, la recta interpretación del testamento resulta imposible. Nunca se insistirá lo bastante en la enorme transcendencia que en esta materia tienen la situación familiar del testador, sus particulares relaciones con las personas beneficiadas, sus costumbres, su mentalidad y hasta el grado de su cultura jurídica *(sobre todo, cuando se está ante un testamento ológrafo o cerrado)."* (Én-

fasis suplido.) El sentido eminentemente subjetivo del acto de testar cobra mayor énfasis "[d]ada la forma privada y generalmente secreta de su redacción, [en que] es más exigible en el testamento ológrafo la garantía de que, en efecto, se trata de una verdadera disposición de última voluntad". J. L. Lacruz Berdejo, *Derecho de Sucesiones*, Barcelona, Ed. Bosch, 1971, Vol. 1, pág. 402.

## III

Teniendo estos principios presentes, intentemos penetrar en el pensamiento fundamental y deseos testamentarios que animaron al causante Torre Noriega. Según surgirá del análisis ulterior, más allá de la faz documental, su última voluntad tuvo el efecto de conjugar complejas instituciones sucesoriales.

De su lectura integral, lo primero que detectamos, es que aunque era lego, poseía una visión bastante precisa de la forma en que nuestro régimen de Derecho sucesorio permite testar. A tal efecto, notamos que en dos ocasiones usó correctamente la forma ológrafa de testamento. En su redacción cumplió con los requisitos formales estatuidos de autografía, fecha y firma. Además, consciente de que había otorgado antes otro testamento, mediante el que nos ocupa —salvo la declaración de adopción de Aida Villafañe Reyes— revocó expresamente el primero. Segundo, tenía un conocimiento básico de cierta terminología legal. Así, al disponer de bienes utilizó palabras de contenido preciso jurídico, tales como "lego" y "tercio de mi libre disposición". Tercero, entendía las consecuencias legales de la paternidad. Con ese propósito completó el estado filiatorio de su prole al reconocer afirmativamente a uno de ellos. Con igual espíritu, reafirmó la adopción de su hija de crianza Aida Villafañe Reyes. Cuarto, previsor de una circunstancia especial, nombró tutores a una hija incapacitada. Y, finalmente, designó determinadas personas albaceas testamentarios.

Todos estos factores son claros indicadores de que Torre Noriega poseía un conocimiento elemental sobre el derecho sucesorio. Esta conclusión queda afianzada si recordamos su condición de ex legislador familiarizado de algún modo con el argot forense que el ejercicio de este cargo acompaña. Como corolario de este conocimiento legal básico, *no podemos incurrir en el error de atribuirle a Torre Noriega un uso laxo e inadvertido del lenguaje consignado en el testamento.*

## IV

Bajo este enfoque, analicemos primero el significado del lenguaje del testamento mediante el cual el causante *legó* a su hija Rixie Torre Ginés el tercio de su libre disposición, *en particular la casa y garage* ubicado en la Calle Muñoz Rivera, esquina José de Diego donde había vivido por más de medio siglo.

En este examen recordamos la admonición de Cossío y Corral, respecto a que "[l]a referencia en un testamento a un legado de parte alícuota puede, en la mayor parte de los casos, significar tan sólo una imprecisión de lenguaje, una elección equivocada de las palabras, y dado el alcance que en la conversación corriente tiene el verbo 'legar', diga que instituye un legado o lega, cuando lo que realmente pretende es instituir un heredero". A. De Cossío y Corral, *Instituciones de Derecho Civil*, Madrid, Ed. Alianza, 1975, T. 2, págs. 902–903. Al explorar todas las alternativas conceptuales posibles, es inevitable concluir que el legado hecho a su hija Rixie del tercio de su libre disposición es uno de parte alícuota y no de institución de herederos. Después de todo, "[e]l testador puede disponer de sus bienes a título de herencia o de legado". Art. 617 del Código Civil, 31 L.P.R.A. sec. 2122. En este extremo no albergamos dudas. El sentido literal de sus palabras no admite otra conclusión. Carecemos de otros elementos que indiquen una intención distinta. "No se trata de que ignore el

verdadero sentido de la palabra 'legar', sino de que quiera legar una parte alícuota de su herencia." M. Albaladejo, *Curso de Derecho Civil*, Barcelona, Ed. Bosch, 1982, T. V, pág. 21. Claramente Torre Noriega plasmó su deseo de dejar a su hija Rixie una porción alícuota de la herencia. Robustece esta conclusión el silencio que mantuvo en cuanto a sus otros herederos y demás cuotas, circunstancia que denota un respeto hacia las legítimas correspondientes. En resumen, donde el testamento dice que "lega" una porción de su herencia hay que reconocer que expresó lo que esa palabra significa. No surge de su contexto que hubiese sido erróneamente empleada. Por ende, no es necesario recurrir a otros métodos de indagación de su voluntad. G. A. Borda, *Tratado de Derecho Civil: Sucesiones*, 4ta ed., Buenos Aires, Ed. Perrot, 1975, T. II, Vol. 6, págs. 348–349.

## V

Lo expuesto nos pone frente a la discutida y compleja figura de "legado parciario" o de cuota alícuota. Este legado "es el que se hace a favor de una o varias personas de una porción aritmética ideal, de una fracción de la totalidad del caudal". González Tejera, *op. cit.*, Vol. I, pág. 15. Según Manresa, en este tipo de legado "el testador dispone a título particular de una porción proporcional de su herencia". J. M. Manresa, *Comentarios al Código Civil Español*, 7ma ed. rev., Madrid, Ed. Reus, 1951, T. VI, pág. 702. Su existencia implica la pugna de dos criterios históricos: los sistemas llamados subjetivos y objetivos. Ambos son "contrapuestos: [e]l *romano*, de matiz *subjetivo*, que considera heredero, a aquel sucesor a quien el testador designe como tal heredero, independientemente, en principio, de que le instituya en toda la herencia, en una parte alícuota de ella o en una cosa cierta y determinada, y el llamado *germánico* o *moderno*, de signo *objetivo*, que conceptúa como heredero a quien sea llamado por el difunto a adquirir la totalidad o universalidad de las rela-

ciones jurídicas objeto de la transmisión, o una parte alícuota del caudal, haya sido o no designado como heredero".

"Consecuencia lógica del punto de vista subjetivo es que puede existir el *legado de parte alícuota* (o, lo que es igual, que el legatario de parte alícuota es simplemente un legatario) y que, por el contrario, la *institutio ex re certa* es, en principio, una verdadera institución de heredero. Dentro del punto de vista objetivo, hay que llegar lógicamente a la conclusión contraria de que no son admisibles la figura del legado parciario ni la del heredero *ex re certa*." Castán, *op. cit.*, 8va ed. rev., 1978, T. VI, Vol. 1, págs. 94–95.

La intención del testador Torre Noriega de disponer a favor de su hija en legado una porción alícuota de la herencia nos obliga a reexaminar esta figura, y determinar si puede prevalecer, o por el contrario, debe estimarse como una de institución de herederos no puesta por estar vedada en nuestro ordenamiento sucesorial.

La figura del "legado parciario" ha sido objeto de análisis cuidadoso por este foro anteriormente en *Blanco* v. *Sucn. Blanco Sancio*, 106 D.P.R. 471, 476 (1977) ; *Gandía* v. *Registrador*, 93 D.P.R. 213 (1966) ; *Vivaldi* v. *Registrador*, 86 D.P.R. 629 (1962). En este último caso examinamos a fondo los argumentos que se hacen a favor y en contra de la posición si nuestro ordenamiento reconoce o no expresamente su existencia a la luz de la glosa española. Además, fue tratada en *Junghanns* v. *Cornell University*, 71 D.P.R. 673 (1950). Nuestros pronunciamientos en esta casuística parecen haber puesto fin a la controversia sobre la existencia de dicha figura en nuestro ordenamiento rechazándola. Proclaman una posición *objetivista*, esto es, la calificación del llamamiento de herederos o de legatario va a depender del *contenido objetivo de la disposición testamentaria*: será heredero aquél en cuyo favor se dispone de la universalidad, o una cuota o porción aritmética de la herencia, y legatario, aquél a favor de quien se disponen bienes específicos o determinados de la herencia.

Si bien estos casos parecen adoptar la posición *objetiva*, a poco reflexionemos notamos que en particular, en el fondo prevalece el análisis *subjetivo*. La posición objetiva se usó como mecanismo para dar cumplimiento a la verdadera voluntad del testador por no resultar ésta clara de acuerdo con los hechos particulares de cada caso. Así, en *Junghanns* v. *Cornell University*, supra, págs. 683–686, dijimos que la intención del testador fue "transmitir" a la universidad todos sus bienes, sujetos a las cargas y condiciones consignadas por lo que en realidad su intención fue instituirla heredera. En *Vivaldi* v. *Registrador*, supra, pág. 642, expresamos, que, "aun cuando admitiéramos el legado de cuota alícuota en contraposición al heredero, es de rigor concluir que la designación a favor de las distintas personas ya mencionadas, en la proporción que se indica, es propiamente una institución de herederos a título universal, aun cuando para ello se usara la palabra 'lego' ". Luego en *Gandía* v. *Registrador*, supra, pág. 220, señalamos que, "expresando la testadora que una vez pagadas sus deudas y los gastos últimos . . . lega la suma restante a él, es patente su *propósito* de atribuir al peticionario la universalidad de su patrimonio". Y más reciente, en *Blanco* v. *Sucn. Blanco Sancio*, supra, págs. 477–478, indicamos que, "[l]a distribución ordenada por Blanco en su testamento muestra con claros perfiles su intención de mantener prácticamente toda la *herencia*, en poder de sus hijas . . . y de sus nietos hijos de éstas. . . . No llega el testador ni a la expresión mínima de dar título de *legado* a la cuota de sus nietos. La disposición en favor de éstos, que tiene por objeto una cuota o parte de la herencia, debe considerarse como institución de herederos".

Estos pronunciamientos y soluciones pueden explicarse a base de la aplicación del Art. 617 del Código Civil, antes mencionado. Por circunstancias específicas en cada caso existía duda sobre la intención del testador de disponer en concepto de legado. Por tal razón se aplicó el mandato de dicho artículo respecto a que "[e]n la duda, aunque el testador no haya

usado materialmente la palabra heredero, si su voluntad está clara acerca de este concepto, valdrá la disposición como hecha a título universal o de herencia". 31 L.P.R.A. sec. 2122. En este sentido, esas decisiones no desterraron permanentemente de nuestras playas la figura del legado parciario. La razón de decidir fue que las palabras utilizadas por cada testador representaban una disposición de bienes a título de herencia.

En el caso de autos no existe problema de interpretar la voluntad del testador. Torre Noriega tuvo la clara intención, y así la plasmó, de disponer a favor de su hija Rixie una porción de la herencia en concepto de legado. En nuestra misión de dar cumplimiento a su última voluntad debemos reconocer dicha figura, a menos que exista alguna disposición legal que la prohíba.

## VI

En España la figura ha sido objeto de intenso debate. Sus partidarios y objetores, ([6]) proponen válidas y persuasivas razones a favor y en contra. Véanse: J. Ossorio Morales, *Estudios de Derecho Privado*, Barcelona, Ed. Bosch, 1942, págs. 119–153; Castán, *op. cit.*, págs. 97–98.

Al explorar los senderos judiciales que hemos de seguir, sirve de orientación persuasiva la jurisprudencia de España. Aunque, con ciertas variaciones, al decir de Castán, en ánimo

---

([6]) Según J. Castán, *Derecho civil español, común y foral*, 8va ed. rev., Madrid, Ed. Reus, 1978, T. VI, Vol. 1, pág. 99, en "el grupo de aquellos expositores que estiman que en el régimen del Código civil no hay lugar para la figura del legado de parte alícuota, en el sentido de que pueda ser considerado como un verdadero legado, podemos citar a Ferrara, De Buen, Ossorio Morales, Bonet y Díaz Cruz.

"Pero hay que reconocer que la posición favorable a la admisibilidad del legado de parte alícuota como tal legado tiene numerosísimos adeptos. Han adoptado ya este punto de vista no pocos de los viejos expositores de nuestro Código civil y la mayoría de los actuales. Basta citar a Sánchez Román, Valverde, Traviesas, Alguer, Sanz Fernández, Roca Sastre, González Palomino, Ortega Pardo, Royo Martínez, Lacruz Berdejo, Cossío, Gullón, Espinar Lafuente, Peña, etc."

de "combinar y conciliar elementos subjetivos y objetivos del derecho hereditario no con fines doctrinales, sino para conceder el debido respeto y atención, tanto como a los preceptos legales, a los fines prácticos perseguidos por los testadores" (Castán, *op. cit.*, 8va ed. rev., 1978, T. VI, Vol. 1, pág. 102) la ha reconocido y "da carta definitiva de naturaleza en nuestra doctrina legal a la figura del legado de parte alícuota, si bien con efectos limitados". Íd., *op. cit.*, pág. 101. Según esta jurisprudencia, "[l]as deudas hereditarias no le afectan personalmente como a los herederos, sino que sólo hacen disminuir el objeto de su adquisición . . . fuera de este injerto de naturaleza subjetiva no puede decirse que, en general, la jurisprudencia de nuestro Tribunal Supremo haya patrocinado abiertamente la pura teoría subjetivista en la materia de que estamos tratando, ya que no pocas veces ha reconocido y destacado como fundamental el criterio objetivo". Íd., págs. 102–103. Finalmente, este prestigioso jurista, luego de exponer las virtudes históricas; comparativas y prácticas de ambos sistemas, concluye:

> Pues bien, para nosotros, si hemos de resolver el problema dentro de los términos que ofrece el Código civil, resulta indudable que a la determinación del concepto de herencia concurre, ante todo y fundamentalmente, el criterio *objetivo*. Los preceptos que regulan y diferencian las cualidades de heredero y legatario no son puramente *interpretativos;* pero constituyen, sí, tipos *normales* que admiten desviaciones excepcionales. Dentro de éstas es donde puede moverse con libertad la voluntad del *de cuius*. Así, la intervención del factor subjetivo es muy limitada y excepcional. Apenas entra en juego más que a través de la figura del legado de parte alícuota, admitida —en la ley y, más que en ella, en la jurisprudencia— por razones históricas e imperativos prácticos, pero con el mero carácter de una institución *excepcional* y *anómala,* que introduce un elemento o matiz subjetivo en nuestro sistema hereditario, fundamentalmente objetivo. Castán, *op. cit.*, 8va ed., 1978, T. VI, Vol. 1, pág. 106.

De su jurisprudencia, cabe citar el siguiente análisis:

El carácter espiritualista de la sucesión en nuestro sistema tradicional y actual, en el cual la voluntad del causante tiene rango de ley, y a ella y a la intención evidente del testador ha de supeditarse para definir la naturaleza del derecho de los llamados a la herencia, sin dejar de valorar el criterio objetivo, latente en el Derecho comparado, afirmando que dentro de la dogmática de nuestro Código civil, para que pueda ser calificado de heredero el llamado a una sucesión, ha de reunir un doble requisito: a) Carácter Universal del llamamiento (suceder a título universal), y b) Que tenga lugar el mismo a título de herencia y no de legado, es decir, voluntad evidente de asignar al sucesor nombre y carácter de heredero (art. 668), de tal forma que si el primer requisito no mediara, y en lugar de atribución universal el llamamiento se limita a circunscribirse a cosa cierta y determinada, no habría heredero sino legatario (art. 768), y si falta el [*nomen heredis*], es decir, la expresión formal en el testamento de asignar este carácter de universalidad al sucesor, se estará en presencia de un legado que, si estriba en una cuota, será el legado de parte alícuota, de tradición en nuestro Derecho. Sentencia del Tribunal Supremo de España de 22 de enero de 1963.

En *Gandía* v. *Registrador*, supra, pág. 218, citamos con aprobación de la S. de 10 de enero de 1920:

"Considerando que el precepto establecido en el art. 668 del Código civil, y en general, cuantos se refieren en el mismo cuerpo legal a la sucesión testada, no otra cosa denotan sino que lejos de supeditarse al ritualismo de nuestro antiguo derecho y al que informaban las instituciones romanas, hoy pueda el testador disponer de sus bienes, en todo o en parte, lo mismo a título de herencia que a título de legado, dependiendo por consecuencia la situación de los que adquieren como sucesores universales o singulares, no de distinciones doctrinarias, a veces de puro nombre, sino de lo que de acuerdo con la realidad y la justicia se acomode a la verdad y a las leyes, con tal que se vea clara y expresa o por lógica interpretación se deduzca la voluntad de transferir a una persona determinada los bienes de que se dispone, con las

inherentes responsabilidades o limitaciones establecidas por el testador, la ley o los derechos preexistentes a favor de otras personalidades."

¿Cuáles serían las consecuencias de permitir libertad en esa disposición testamentaria?

Según Puig Brutau, "existen dos maneras capitales de ordenar el derecho sucesorio por causa de muerte, pues cabe estimar que el conjunto de bienes y de relaciones jurídicas de toda clase del causante forman una masa patrimonial en liquidación (sistema de *common law*) o que se trata de un patrimonio en conservación y destinado a refundirse con el propio heredero o herederos, de manera que éstos se colocan en el lugar o posición jurídica que ocupaba el causante (sistema romano)". J. Puig Brutau, *Fundamentos de Derecho Civil*, 2da ed., Barcelona, Ed. Bosch, 1975, T. V, Vol. 1, pág. 81.

De Cossío y Corral, *op. cit.*, pág. 902, expone:

Cualitativamente se ha suscitado el problema de la posibilidad de atribución de parte alícuota de la herencia a título de legado, y no de heredero, como parece admitir el artículo 1.065, 4.°, de la L. de E.c. cuando entre las personas legitimadas para promover el juicio universal de testamentaría, señala a los legatarios de parte alícuota. En realidad, la cuestión pudiera parecer meramente nominal, porque si el llamamiento no es sobre bienes concretos y determinados, sino sobre una fracción alícuota de la totalidad, ¿qué diferencia puede existir entre que se le confiera o no el título de heredero? La cuestión, sin embargo, es mucho más profunda, porque el heredero representa a la herencia y responde de las deudas de la misma, en tanto que el legatario carece de esa representación y se encuentra desvinculado de esa responsabilidad. En el fondo, el problema pudiera plantearse con mayor exactitud en estos otros términos: ¿el testador tiene facultades para exonerar personalmente al heredero, legal o testamentario, de las deudas de la herencia? Y, por otra parte, ¿puede imponerse al heredero legal o testamentario la obligación de responder personalmente, imponiéndole además la de entregar a un legatario una parte alícuota de los bienes, sin que en la determinación de los

bienes que constituyen esa parte deban ser deducidas previamente las deudas que constituyen el pasivo hereditario?

Aunque por su amplia regulación de la institución de herederos nuestro ordenamiento sucesorio tiene una base sólida romanista, "no se puede prescindir de la tendencia espiritualista o de acatamiento de la voluntad del testador, que fluye, no sólo del arraigo que en nuestro país tiene el legado de parte alícuota, como institución distinta de la de heredero, y del entronque subjetivista del vigente Derecho español con el romano, las Partidas y el Ordenamiento de Alcalá, sino también y principalmente, de los artículos 675 y 668 del Código [equivalentes a los Arts. 617 y 624], que imprimen a la intención del causante el rango de ley de la sucesión, máxime en aquellos casos en que por existir disposición testamentaria de tipo ético-afectivo o jurídico-familiar, resulte más acusada la distinción, o en aquellos otros en que aparezca diáfana la voluntad del testador en el sentido de que uno de los instituidos sea el continuador de su personalidad y otro sea legatario de parte alícuota, incluso con exención de cargas; por lo que procede concluir que en el estado actual de nuestro Derecho positivo no existe identificación absoluta de los conceptos de heredero y de legatario de parte alícuota, siquiera el trato jurídico de ambos ofrezca múltiples aspectos de coincidencia por la nota común que los preside, como sucesores a título de atribución de bienes indeterminados". S. de 16 de octubre de 1940, según citada en Puig Brutau, *op. cit.*, págs. 88–89.

■ En resumen, los efectos de admitir la existencia del legado de parte alícuota frente a la institución de herederos es permitir al testador la libertad de instituir un heredero para que le suceda en el activo y pasivo de la herencia, colocándose en su lugar en cuanto a todas las relaciones jurídicas transmisibles o de nombrar a un legatario parciario para que éste obtenga una fracción del saldo activo resultante después

de saldar las deudas del causante. Puig Brutau, *op. cit.*, págs. 85 y 90.

El Tribunal Supremo de España al atemperar el impacto del criterio objetivista de la herencia y reafirmar la S. de 16 de octubre de 1940, antes transcrita, expresó que era admisible "la calificación de legado dada por el testador a la institución en una cuota, parte del as hereditario en su porción libre, esta modalidad irregular de la institución constituye una figura intermedia o '*sui generis*' entre el legado y la herencia propiamente dichos, con múltiples aspectos de coincidencia entre uno y otra por la nota común que los preside de atribución de bienes indeterminadamente, y esta nota común se traduce singularmente en que a la muerte del causante [,] el legatario como el heredero adquieren un derecho abstracto que es preciso concretar o determinar mediante la partición, para poder fijar materialmente el contenido económico de la herencia y del legado, previa deducción de cargas y gravámenes, quedando así equiparados [en] este aspecto por idéntico interés, el heredero y el legatario de parte alícuota a los que afecta por igual la responsabilidad referente a gastos comunes de la partición . . .". S. de 11 de enero de 1950, Núm. 16, 29 Jurisprudencia Civil 140, 152–153; M. Armero, *Testamentos y Particiones*, Madrid, Ed. Reus, 1951, Vol. 1, pág. 41.

Concluimos que la figura del "legado parciario" tiene cabida en nuestro ordenamiento sucesorio. Permite al testador decidir si quiere instituir un heredero para que le sustituya en su lugar transmitiéndole todos sus derechos y obligaciones, Art. 599 del Código Civil, 31 L.P.R.A. sec. 2081, o disponer de una porción de sus bienes a favor de un legatario para que éste la obtenga si sobran activos luego de liquidar las obligaciones. La importancia de esta figura cobra más realce por la norma vigente de que el instituido como heredero, responde con su patrimonio por todas las deudas del causante si acepta la herencia sin acogerse al beneficio de inventario,

situación susceptible de ocurrir hasta inadvertidamente en cuanto a familiares cercanos del causante. Así, el Art. 953 del Código Civil, 31 L.P.R.A. sec. 2781, considera que existe aceptación tácita de la herencia cuando se realizan actos que suponen tal intención o que no había derecho a ejecutar sino con la cualidad de herederos; el Art. 954 (31 L.P.R.A. sec. 2782) enumera tres actos de enajenación por los cuales se entiende aceptada la herencia; el Art. 968 (31 L.P.R.A. sec. 2805) dispone que el heredero que tenga en su poder los bienes de la herencia o parte de ellos tiene diez días, a partir de que supiere ser tal heredero, para acogerse al beneficio de inventario si residiere en el lugar donde hubiese fallecido el causante, y 30 días si residiere fuera.

Nuestro ordenamiento sucesorio está cimentado en dar cumplimiento a la voluntad del testador en la disposición de sus bienes en lo que no sea contrario a la ley. Si la intención de Torre Noriega fue dejar una porción alícuota de la herencia como legado a su hija Rixie sin que ésta tuviere que responder por sus obligaciones y con todas las consecuencias legales aplicables a los legados, debemos acatar esa voluntad.

El profesor González Tejera explica la utilidad de permitir el "legado parciario":

> . . . Un causante que interese proteger a las personas llamadas a recibir su herencia de las consecuencias de la responsabilidad ultra vires, tiene grandes dificultades en hacerlo si solamente puede llamarlos como herederos o como legatarios. Las circunstancias del caudal, los cambios que puedan ocurrir en el mismo entre el otorgamiento del testamento y el deceso del testador, las características de los sustitutos, las oscilaciones económicas del patrimonio transmisible, etc., pueden requerir un llamamiento a título de legado, pero de contenido indeterminado, si es que se quiere proteger a unos sustitutos, cuya capacidad para protegerse de una aceptación pura y simple es dudosa. En estos casos, el legado de parte alícuota, o legado parciario, parece ser la solución. La alternativa es abolir la responsabilidad ultra

vires del heredero universal en Puerto Rico, pero en ausencia de una expresión legislativa sobre este extremo, que favorecemos, el Tribunal puede, rehabilitando la figura del legado de cuota, proveer esa tercera alternativa que tanto testador consciente necesita en nuestro medio. González Tejera, *op. cit.,* Vol. 1, pág. 22.

■ Esta figura es aun de mayor utilidad, ya que nuestro ordenamiento permite al heredero que renuncie la herencia y que acepte el legado o viceversa. Art. 812 (31 L.P.R.A. sec. 2501).

■ Al aplicar al caso de autos los pronunciamientos expuestos, decidimos que erró el tribunal de instancia al no resolver que la disposición hecha por el causante del tercio de su libre disposición a favor de su hija Torre Ginés era un "legado parciario" válido. Por tratarse dicha disposición de un "legado parciario" estamos ante un testamento sin institución de herederos en el cual el testador dispuso a título de legado de una porción de la herencia y de varios bienes específicos de la misma. Tal actuación está permitida por el Art. 693 del Código Civil preceptivo de que el "testamento será válido aunque no contenga institución de heredero . . . . En estos casos se cumplirán las disposiciones testamentarias hechas con arreglo a las leyes, y el remanente de los bienes pasará a los herederos legítimos". 31 L.P.R.A. sec. 2282. Véase Lacruz Berdejo, *op. cit.,* pág. 542.

Como corolario, no es de aplicación a autos el Art. 742 del Código Civil que versa sobre la preterición de alguno o todos los herederos forzosos en el testamento. 31 L.P.R.A. sec. 2368. No existe ninguna institución de heredero que pueda quedar anulada. Los legados dispuestos por Torre Noriega en el testamento son válidos. Sólo deberán reducirse a petición de los herederos forzosos en lo que fueren inoficiosos. Art. 745 del Código Civil, 31 L.P.R.A. sec. 2371, y Art. 693, *ante.*

## VII

Establecida la naturaleza y vigencia del "legado parciario", examinemos el verdadero significado y alcance de la disposición de bienes específicos legados a su hija —en particular la casa y el garage ubicados en la Calle Muñoz Rivera en que había vivido por más de medio siglo— y el legado al Estado de los edificios y anexos sitos en la Calle Muñoz Rivera, Núms. 13 y 15, en Ciales, usados por varios años como dependencias gubernamentales y por el Partido Popular Democrático (P.P.D.) sin compensación.

La recurrente Torre Ginés sostiene, que en virtud del lenguaje testamentario su padre no tuvo la intención de legar al Estado los terrenos en que están sitos los edificios y anexos. Por su parte, el Estado aduce que este argumento operaría en contra de ella, pues sólo le legó la "casa y el garage", sin expresión alguna sobre la propiedad en que están situados. El juez de instancia resolvió que los terrenos estaban incluidos en ambos legados.

Bajo el prisma de apreciación subjetiva, según el tenor del testamento, nos parece razonable concluir que Torre Noriega no tuvo la intención de legar a su hija ni al Estado, los terrenos. Primero, expresamente usó las palabras "casa, garage, edificio y anexos". Segundo, excluyó toda referencia al concepto unitario de "inmueble" o, en particular, a "solar, terrenos" u otros vocablos análogos o parecidos. Es orientador que aparte de mencionar la casa, señaló directamente su garage, y con referencia a los edificios, únicamente incluyó sus anexos. Las palabras del testador tienden a proyectar una imagen visual de estructuras físicas *sobre* la superficie que no comprende terrenos. Y tercero, en cuanto a la casa notamos que aludió a que esa era su residencia por más de medio siglo, *detalle que encuentra concordancia con el hecho de que también había servido, y en la actualidad es, la residencia de la*

legataria Torre Ginés. De igual modo, hizo mención a que los edificios eran "utilizados" por el Estado y el P.P.D.

En su contexto lógico, sustantivo y teleológico, este lenguaje es indicativo de una intención de sólo legar las estructuras y excluir sus terrenos. La "enumeración limita o restringe el alcance de la voluntad testamentaria o, por mejor decir, la define más paladinamente, circunscribiéndola a los objetos que realmente eran objeto de la transmisión". C. De Diego, *Dictámenes Jurídicos*, Madrid, Ed. Bosch, 1958, pág. 373. Igual resultado se impone al disponer a favor de su hija Torre Ginés el tercio de su libre disposición, y en "particular" la casa y garage. La expresión "en particular" intercalada inmediatamente después de legarle el tercio de libre disposición, es manifiestamente indicativa de que dicha propiedad la obtuviera *como parte* del pago del tercio de libre disposición y no en adición al mismo.

## VIII

Resuelto que es válido el "legado parciario", y definido el contenido de los legados sobre bienes inmuebles específicos de la herencia hechos por el causante Torre Noriega, procedemos a considerar el procedimiento a seguir en la liquidación de la herencia. Advertimos que a causa de que las tasaciones de los legados a la recurrente Torre Ginés y al Estado presentadas para evaluación no desglosan el valor de los terrenos y las estructuras, estamos impedidos de adjudicar con precisión matemática la cuestión. Corresponderá al foro de instancia como parte del mandato.

Dicho foro, en su sentencia citó correctamente al profesor González Tejera, *op. cit.*, Vol. II, pág. 412, en el sentido de que "El legado hecho a un descendiente que es a su vez heredero . . . se reputa pagadero de la porción libre, lo mismo que cuando el legado es hecho a un extraño. Sin embargo, cuando el valor del legado hecho a un hijo o descendiente no

cabe en la porción libre, se reputa mejora en cuanto a su exceso". No obstante, erró al aplicar esa norma a los hechos del caso al limitar la porción disponible en el tercio libre en su totalidad a los legados del Estado e imputar en su totalidad el tercio de mejoras al de la recurrente Torre Ginés. Al remitir el caso a instancia, dicho foro observará las siguientes normas:

(1) La primera etapa de la liquidación de la herencia —una vez se ha realizado el inventario de los activos y los pasivos que forman parte de la misma— es pagar a todos los acreedores conocidos. "Esta preferencia por los acreedores sobre los legatarios, herederos y acreedores de los herederos, brinda bastante garantía y protección a los acreedores del causante en una herencia solvente." González Tejera, *op. cit.*, Vol. I, pág. 187. Los acreedores tienen preferencia sobre el pago de los legados en el caudal de la herencia, pues no podrán pagarse éstos sino después de satisfechos todos los acreedores. Art. 981 del Código Civil, 31 L.P.R.A. sec. 2818.

(2) Una vez se han pagado las deudas de la herencia de los acreedores conocidos, los herederos tienen la obligación de satisfacer los legados dispuestos en el testamento en cuanto no sean inoficiosos por perjudicar sus legítimas. González Tejera, *op. cit.*, Vol. II, págs. 360–361. Art. 783 del Código Civil, 31 L.P.R.A. sec. 2472, y Art. 693, *ante.*

En el caso de autos existe un legado de una porción aritmética del caudal a favor de la recurrente Torre Ginés y en particular la casa y garage ubicados en la Calle Muñoz Rivera, esquina José de Diego. También están los legados particulares al Estado de los edificios y anexos situados en la Calle Muñoz Rivera Núms. 13 y 15 en Ciales.

(3) En virtud del foro de instancia haber incluido los terrenos en los legados de las estructuras, ante la ausencia de valores separados, carecemos de los elementos de juicio para cuantificar los bienes y distribuir la herencia. Una vez sumado el valor total de los bienes, una tercera parte, corresponderá

a la porción *libre* disponible, otra tercera parte de igual cantidad al tercio de *mejora,* y la restante al tercio de *legítima estricta.* Art. 737 del Código Civil, 31 L.P.R.A. sec. 2363.

(4) Si los bienes de la herencia no alcanzaren para cubrir todos los legados, el Art. 809 del Código Civil, 31 L.P.R.A. sec. 2498, provee un orden de preferencia. Aquí, según el orden indicado, los legados de cosa cierta y determinada tienen preferencia de pago. Cuando "el causante designa legatarios de cuota alícuota con legatarios ordinarios, entendemos que estos últimos deben cobrar primero". González Tejera, *op. cit.,* Vol. 1, pág. 25. La razón de la preferencia de pago de los legados ordinarios, sumada al orden establecido en el Art. 809, —como dijéramos al citar la S. de 11 de enero de 1950 del Tribunal Supremo de España— reside en que para que pueda concretarse la porción correspondiente al legatario es menester primero liquidar la herencia. El legado ordinario puede y debe pagarse una vez saldadas las deudas de la herencia, sin que sea necesario llevar a cabo la partición, siempre y cuando se protejan las legítimas de los herederos forzosos.

(5) Todos los legados ordinarios, incluso los hechos a un heredero forzoso, tienen que imputarse primero al tercio libre. González Tejera, *op. cit.,* Vol. II, pág. 412. Si los legados ordinarios sobrepasan la porción disponible del tercio libre, será necesario que éstos —por tener el mismo orden de preferencia en pago— se reduzcan a prorrata, o sea, proporcionalmente a su respectivo valor, en lo que no quepa en la porción del tercio libre disponible. Art. 748 del Código Civil, 31 L.P.R.A. sec. 2374.

(6) En cuanto al legado particular de la casa y su garage, hecho a su hija Torre Ginés, por ser ella heredera forzosa, le será aplicable la norma de que se reputará mejora en lo que no quepa en la porción libre. Aunque el testador no haya expresado claramente su intención de mejorarla, ello se impone en

virtud de la norma de interpretación supletoria de ley, por el hecho de no caber el legado hecho a un heredero forzoso en la porción libre disponible. *Dávila* v. *Agrait,* 116 D.P.R. 549 (1985). González Tejera, *op. cit.,* Vol. II, pág. 423. "Del hecho de no caber en el tercio libre *el legislador nos dice que se puede* comprobar que la intención del testador fue atribuir el *exceso del legado en concepto de mejora.*" (Énfasis suplido.) íd., págs. 423–424. Art. 755 del Código Civil, 31 L.P.R.A. sec. 2395.

■ (7) Con relación al "legado parciario" a su hija Torre Ginés, también resulta de aplicación, por ser característico del legado, el precepto de que se reputará mejora en lo que no quepa en la porción libre. Art. 755, *supra.* Adviértase, sin embargo, —según previamente concluido— que la expresión "en particular" es indicativa de un legado específico de la casa y garage. Por ende, debe computarse como parte del legado del tercio y no como una adición al mismo. A tales efectos, al calcularse el valor del "legado parciario" deberá primero determinarse el valor de la casa y garage y restarse de la suma a que ascienda el tercio de la herencia. Esta diferencia equivaldría al monto del "legado parciario" correspondiente a la recurrente Torre Ginés. Dicha suma deberá imputarse primero al tercio libre —pero si éste ya hubiese sido agotado por los legados ordinarios, o en lo que no quepa en dicho tercio— se imputará al tercio de mejora.

En cuanto al sobrante de la herencia le será de aplicación los principios sobre sucesión legítima.

Por los fundamentos expuestos, *se expedirá el auto y dictará sentencia revocatoria de la emitida por el Tribunal Superior, Sala de Arecibo el 12 de marzo de 1986. Continuarán en instancia los trámites compatibles con estos pronunciamientos.*

El Juez Asociado Señor Rebollo López concurre en el resultado sin opinión escrita.